Michael Machat, Esq. SB#109475
MACHAT & ASSOCIATES, P.C.
8730 W. Sunset Blvd., Suite 250
West Hollywood, California 90069
Telephone: (310) 860-1833
Email:  michael@machatlaw.com

David A. Randall (SBN 156722)
dave@hdmnlaw.com
Ehab Samuel (SBN 228296)
esamuel@hdmnlaw.com
HACKLER DAGHIGHIAN MARTINO & NOVAK P.C.
10900 Wilshire Blvd., Suite 300
Los Angeles, CA 90024
Tel.: (310) 887-1333
Fax: (310) 887-1334

Attorneys for Plaintiff
Vampire Family Brands, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VAMPIRE FAMILY BRANDS, LLC,<br><br>            Plaintiff,<br><br>    vs.<br><br>S.C. CRAMELE RECAS, S.A., TRI-VIN IMPORTS, INC, BRACUS IMPORTS LLC and DOES 1 – 20,<br><br>            Defendants. | CASE NO. 2:20-cv-08223-VBF-PVC<br><br>Related Case:  2:06-cv-07793-VBF-JWJ<br><br>**FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS, TRADEMARK INFRINGEMENT, TARNISHMENT, AND UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff VAMPIRE FAMILY BRANDS, LLC hereby alleges and asserts:

## I.   <u>JURISDICTION AND VENUE</u>

1.      Plaintiff brings this action for injunctive relief and damages arising out of a breach of a stipulated judgment as well as the unauthorized, unfair, and deceptive competitive practices of Defendants, and each of them, in connection with the commercial use and exploitation of trademarks in violation of the Lanham Act.

2.      This action arises under the Trademark Laws of the United States, including particularly, Section 43 of the Lanham Act, 15 U.S.C. §§ 1114 and 1125. Jurisdiction is conferred on this Court by 15 U.S.C. Section 1121(a), by 28 U.S.C. Section 1338(a), in that this case arises under the Trademark Laws of the United States, 15 U.S.C. Sections 1051, *et seq.*, and by principles of pendent jurisdiction. Venue is proper in this District under 28 U.S.C. §§ 1391(b).

3.      Jurisdiction is also conferred on this Court by 28 U.S.C. §§ 1332 in that the parties are citizens of different states and that the amount in controversy exceeds $75,000.

## II.   <u>THE PARTIES</u>

4.      Plaintiff VAMPIRE FAMILY BRANDS, LLC ("VAMPIRE FAMILY BRANDS") is a Delaware Limited Liability Company with its main business office located in Los Angeles County, California.

5.      Defendant S.C. CRAMELE RECAS, S.A ("CRAMELE RECAS") is upon information and belief, a winery located in Recas, Romania.  Cramele Recas has waived any jurisdictional challenge it might conceivably have had to this case when it executed the Stipulated Judgment attached to this Complaint as Exhibit 1.

6.      Defendant Tri-Vin Imports, Inc ("Tri-Vin") is a New York corporation with its corporate offices located in New York.  Tri-Vin is a US

Importer for Cramele Recas and an agent of Cramele Recas's for its wine sales in the U.S.  Tri-Vin regularly does business in California, including regularly buying wine from California that it resells around the country and regularly selling wine into California.  Tri-Vin also has a California distributor, based in this district, that it sells wine to for distribution and, on information and belief, has set up an affiliate within California to act as its agent with respect to the importation and distribution of wine, as well as to conduct other business, within the State on its behalf.  Tri-Vin regularly apply for and file trademark applications using a lawyer based in this District.  Tri-Vin representatives, including Marc Oliveira, regularly travel to California for wine shows such as the ECRM, which has been held in rotating locations, including Napa, San Diego, and Orange County.  Tri-Vin is targeting sales of the Accused Products discussed below into California.

7.     Defendant Bracus Imports LLC ("Bracus") is a California Limited Liability Company with a California address of 1091 Essex Ave, Richmond, CA 94801 according to the Statement of Information filed by Bracus with the California Secretary of State.  Bracus was formed in May of 2019, and the formation papers list Courtney Taylor, an attorney in San Luis Obispo as its agent for service of process.  A copy of the registration Certificate and Statement of Information is attached as Exhibit 2 to this Complaint.

8.     On information and belief, Marc Oliveira whom is listed as a Manager of Bracus, is the same Marc Oliveira that is the President of Defendant Tri-Vin. The other manager listed is Michele Oliveria, whom, on information and belief, is Marc Oliveira's  wife.  In September of 2019, Bracus obtained licenses from the California Department of Alcohol Beverage Control to import and wholesale wine and beer in the State of California.  Indeed, later that same year, Cramele Recas shipped wine from Romania to the Oakland Port listing Tri-Vin Imports as the consignee.  Upon information and belief, Bracus used its import license to clear the

shipment for Tri-Vin.   Upon information and belief, Tri-Vin and/or Bracus on behalf of Tri-Vin warehouse wines in Northern California.   Bracus's licenses to import and wholesale wine and beer with the California Department of ABC are still active as they were renewed a few months ago.

9.   TI Beverage Group, Ltd ("TI Beverage Group" or "TIBEV") is a Delaware Corporation that assigned its interest in the Vampire wine business to Plaintiff Vampire Family Brands in 2017, including its interest in the Stipulated Judgment and Settlement Agreement (discussed below) with defendant Cramele Recas.   TI Beverage Group is the predecessor in interest to Vampire Family Brands – both companies were and are primarily owned by Michael Machat, the founder and creator of the Vampire Brand, and Plaintiff's in-house counsel.

10.   Plaintiff does not know the true names or capacities of defendants named herein as DOES 1 through 20 inclusive, and therefore sues these defendants by such fictitious names.   Plaintiff will seek leave to amend this Complaint to allege the true names, capacities, and circumstances alleging the liability of said defendants at such time as the same is ascertained.   Plaintiff is informed and believes and, on that basis, alleges that each fictitiously named defendant is responsible in some manner for the occurrences herein alleged and that Plaintiff's damages as herein alleged were proximately caused by the conduct of such defendants.

11.   At all times herein mentioned, Plaintiff is informed and believes and based thereon alleges that, at all times herein mentioned, each of the defendants sued herein, were the agents, servants, employees or attorneys of their co-defendants, and in doing the things hereinafter alleged were acting within the purpose, course and scope of such agency and employment, and with the authority, permission, and consent of their co-Defendants.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   FACTS GIVING RISE TO THIS ACTION

12.   Plaintiff VAMPIRE FAMILY BRANDS via its predecessors in interest has been marketing food and beverages under the following brand names for many years, including:  VAMPIRE (for wines – US Trademark Registration No. 2263907); DRACULA (for wine – US Trademark Registration No. 3319536); VAMPYRE (for Spirits – US Trademark Registration No. 3082097); VAMPIRE (for chocolate and coffee  - US Trademark Registration No. 3669827) VAMPIRE for Olive oil and Balsamic vinegar – US Trademark Registration No. 4776927); VAMP H20 (for Water – US Trademark Registration No. 3895288); VAMPIRE (for Restaurant and Bar Services – US Trademark Registration No. 3978444); VAMPIRE (for Glass beverage-ware -- US Trademark Registration No. 3290011); and VAMPIRE TACO (for Tacos – US Trademark Registration No. 4939034).

13.   By virtue of its extended use in commerce, several of the aforementioned registrations have become incontestable, including its registration numbers 2263907, 3082097, 3290011, 3319536, 3669827, and 3978444.

14.   VAMPIRE FAMILY BRANDS also is the owner of the slogans TASTE OF IMMORTALITY and SIP THE BLOOD OF THE VINE, (TM Registrations 3167606 and 3079403, respectfully.)  Both of these marks also have become incontestable.

15.   Additionally, Plaintiff sells a Spanish sangria, playfully branded as FANGRIA.  Plaintiff has an incontestable trademark registration for this too, US Trademark registration no. 4451648.   The etymology for Sangria is bloodletting in Spanish and Portuguese.  Plaintiff's promotional materials for FANGRIA feature illustrations of vampires, vampire bats and blood.

16.   Through substantial use in commerce in connection with the sale of wine, not only in California but throughout the U.S., VAMPIRE FAMILY BRANDS has also become the owner of several unregistered, but distinctive

common law trademarks for wine, including the use of the slogan "The Legend Lives," vampire bats. and blood drops on wine bottle labels, and other associated product packaging and promotional materials, the use of coffin shaped boxes for wine, the use of vampire capes for draping on bottles of wine, and the use of blood red capsules on its bottles of Vampire Wine.   These common law marks are collectively referred to herein as "VFB's COMMON LAW MARKS." [Please see Exhibit 3]

17.   The origin of Vampire wine, and VAMPIRE FAMILY BRAND's claim of right goes back to 1988, when its founder released a French bottled Algerian Syrah under the brand name Vampire.   The first sale was to MCA Records and Alice Cooper, and the wine was promoted under the slogan, "Sip the Blood of the Vine."   Vampire Family Brand's predecessors in interest began to use the slogan "Taste of Immortality" by at least 1995, if not earlier.   Although the labels have changed over the years, along with the sourcing from Algeria to Italy to Transylvania and finally to Napa, the marketing has remained playful.

18.   However, as the source of the wine shifted from Transylvania, Romania to Napa, California, the marketing evolved to emphasize that the quality of the wine was actually extremely good, with Vampire wine having won numerous gold medals throughout the years and winning scores of 90 Points and higher.

19.   Plaintiff via its predecessors' in interest expanded its wine and spirits business into gourmet quality foods, including Vampire Fine Belgian Chocolate and Vampire Gourmet Coffee (U.S. Reg. No. 3669827) and Vampire Gourmet Olive Oil and Vampire Gourmet Balsamic Vinegar (U.S. Reg. No. 4776927).

20.   Plaintiff is also the owner of the US Registration No. 5444375 for the word mark VAMPIRE for Pre-mixed alcoholic beverages, other than beer based, and Prepared Alcoholic Cocktails.   Plaintiff has a great tasting Gourmet Bloody

Mary cocktail, that it markets as its VAMPIRE Gourmet Bloody Mary Cocktail. VAMPIRE FAMILY BRANDS' registered trademarks referenced in Paragraphs 12, 13, 14, and 18 are hereinafter referred to as VFB's REGISTERED MARKS. VFB's REGISTERED MARKS and VFB's COMMON LAW MARKS are collectively referred to herein as the VAMPIRE Family of Brands.

21.     Plaintiff's VAMPIRE Family of Brands are available for the world to see on its website VAMPIRE.COM, and Plaintiffs' VAMPIRE Family of Brands have received coverage in various national magazines and newspapers, including Maxim, InStyle, Elle, Shape, Star Magazine, the New York Times, the LA Times, the Houston Chronicle, The Star Tribune, The Chicago Sun Times, and many more.  In addition, Plaintiffs' VAMPIRE family of brands have been shown on various national television shows, such as The View with Oprah Winfrey, Anderson Cooper for approximately five minutes with Ashley Greene from Twilight fame, CNN Headline News, MTV's Viva La Bam, Food TV, and many more.

22.     In 2017 Plaintiff began selling VAMPIRE Gourmet Bloody Mary Cocktails in a can which are designed to be the go-to ready to drink premixed Bloody Mary, perfect for busy bars, outdoor venues, picnics, and anyone on the go wanting a gourmet ready to drink Bloody Mary cocktail.

23.     Plaintiff also markets and sells wine branded as Dracula and has been doing so for more than a dozen years.  Plaintiff is the owner of US Trademark Registration No. 3319536 or Dracula for wine.

24.     Plaintiff's VAMPIRE wines have traditionally sold very well during the Halloween season.  For example, in 2016, 2017, and 2018 VAMPIRE wine was a top selling wine in Publix during the month of October.  VAMPIRE Cabernet and VAMPIRE Pinot Noir were the number 8 and 9 top selling red wines at Publix in October 2018--with the VAMPIRE Cabernet being the 4th bestselling

cabernet in Publix during the month of October and VAMPIRE Pinot Noir being the 2nd bestselling Pinot Noir after Meiomi Pinot Noir.

**A.  The Early Years of Vampire Wine**

25.     Back in the mid-1980s, when Michael Machat first thought up the idea of branding a wine as Vampire, all those he discussed the idea with thought he was crazy.  They didn't get the marketing idea because back then wine was meant to be revered and the idea seemed almost sac-religious to the staid wine industry.  But the idea stayed with Machat.  At first, Machat attempted to find a winery supplier in Transylvania.  That was in the late 1980's and Romania was a communist country.  There was only one exporter of wine, government controlled, and they told him they already had a US Importer – Monsieur Henri, a subsidiary of Pepsi Cola.  They also told Machat they had a UK importer, so they were not interested in hearing Machat's ideas.

26.     So unperturbed, beginning in 1988, Machat began selling in England, an Algerian Syrah, bottled in France, that was packaged in a coffin shaped box.  The first customer was Alice Cooper's record company, MCA Records.

27.     In 1989, Machat moved the production to Italy.  Around that time, he exported some of his Vampire Wine to the US, which found its way to the Anne Rice Fan Club in New Orleans.

28.     After the Berlin Wall fell, Machat contacted the Pepsi Cola Company.  He obtained a meeting with the man who ran the US Romanian wine import side of the company.  He was about to retire, and after first presenting Machat's concept of marketing VAMPIRE Wine from Transylvania to his employer (who passed), he agreed to introduce Machat to the people that ran the Romanian export operation in Bucharest.

29.    A few months later, Machat was on his way to Transylvania where he began to source wine suitable for his nascent VAMPIRE brand.  There were many starts and stops, as the Romanian people didn't understand the concept.  Marketing had been illegal since 1945, and the Romanian people had no idea how to market.

30.    For example, when Machat first arrived at Bran Castle in 1991, the castle where Vlad Tepes—also known as Dracula—lived, and the place—some say—that inspired Bram Stoker to write Dracula, was nothing but a furniture museum.

31.    As Machat toured wineries, some winemakers screamed in horror when told that Machat wanted to label their prized wine as VAMPIRE.

32.    Machat persevered and eventually he was able to find Romanian wineries to supply wine for his VAMPIRE brand.  Unfortunately, over the years, the supply was not consistent and problems always seemed to arise.  So Machat kept changing wineries in Romania looking for a satisfactory one.

33.    Eventually Machat met Philip Cox, an Englishman who runs Cramele Recas with his Romanian wife, Elvira Cox.  Machat trusted them and arranged for Cramele Recas to make Vampire wine.

34.    Unfortunately, they became greedy and got tired of listening to Machat's quality control demands.  They decided to come out with their own wine brand that took elements of Machat's designs.

35.    At that time, and still to this day, Machat's VAMPIRE wine labels, featured a V with a drop of blood at the beginning of the word Vampire.  The back labels used to include the slogan "The Legend Lives," which Plaintiff owns as a trademark for wine.

36.    Eventually Machat discovered that Cramele Recas was selling wine with a prominent V (both with a drop of blood and without) over the words "The Legend Lives" and the word Transylvania, falsely giving the impression that the

wine was the same wine as Vampire wine.  TI Beverage Group sued for trademark infringement and during the discovery process acquired video footage from over twenty retail stores in which store clerks were telling patrons the counterfeit wine was the same as VAMPIRE Wine.

37.    At that time, TI Beverage Group had a credit line with the winery for approximately one million dollars.  In the fall of 2006, TI Beverage withheld payment otherwise due to Cramele Recas but for the trademark infringement and put the amount owed to Cramele Recas into a CD.  Later that year, TI Beverage Group sued Cramele Recas and Cox for trademark infringement.

38.    The case settled, and the parties executed a Stipulated Judgment which was signed by the Judge and became an Order of this Court.  A copy of the Stipulated Judgment from the case, which was entitled TI Beverage Group, LTD v. S.C. Cramele Recas S.A., et al., Case No. CV-06-7793 VBF, is attached as Exhibit 1 to this Complaint (hereinafter "the Stipulated Judgment").  The Stipulated Judgment was part of an overall Settlement Agreement ("the Settlement Agreement") agreed to by TI Beverage Group and Cramele Recas and Philip Cox. Vampire Family Brands is the assignee of TI Beverage Group, and now has all rights to enforce the Stipulated Judgment and Settlement Agreement.

39.    The Stipulated Judgment and Settlement Agreement provided in part that, in exchange for TI Beverage Group paying Cramele Recas Five Hundred Fifty Thousand Dollars, Cramele Recas and Cox and each of their agents and assigns agreed to cease and desist from any of the following:

a.    Using Vampire, Vampyre, Vampire Vineyards, Vamp, the Vamp icon, or any other word or words or marks which are confusingly similar to, or a colorable imitation of any of the aforementioned trade names and marks, either alone, as part of, or together with, any other word or words, trademark, service mark,

trade name, or other business or commercial designation in connection with the sale, offering for sale, advertising, and/or promotion of beverage products and beverage accessories anywhere throughout the World.

b.      Using the letter V, as a trademark, either alone, or with a blood drop, as part of, or together with, any other word or words, trademark, service mark, trade name, or other business or commercial designation in connection with the sale, offering for sale, advertising, and/or promotion of beverage products and beverage accessories anywhere throughout North America.

c.      Representing directly or indirectly by words or conduct that any beverage product or beverage accessory offered for sale, sold, promoted, or advertised by any of the RECAS parties, is authorized, sponsored by, endorsed by, or otherwise connected with any of the TI parties.

40.      The Stipulated Judgement and Settlement Agreement also provided for liquidated damages of $10,000 per incident plus $1 a bottle sold, giving TI Beverage Group the option to forego the liquidated damages and seek the full extent of damages, if it chooses.

## B.  Cramele Recas and Philip Cox's prior breach.

41.      Just several years after agreeing to enter the Stipulated Judgment and the Settlement Agreement referenced above, Cramele Recas began selling a wine called DRACULA'S BLOODLUST to a company in Missouri.  TI Beverage Group sued.  In letters to Machat, Cox argued that Dracula was not covered by the Stipulated Judgment and the Settlement Agreement even though he should have known Dracula is the most famous of all Vampires.

42.   Cramele Recas defaulted and TI Beverage Group obtained a default judgment against Cramele Recas for $25,192. [Dkt No. 87 in related case 2:06-cv-07793-VBF-JWJ.]

43.   In 2017, Vampire Family Brands acquired TI Beverage Group's interest in the Settlement Agreement and the Stipulated Judgment and all aspects of the Vampire Wine business and is a privity to the prior judgments with Cramele Recas.  Upon information and belief, the Missouri company stopped selling the infringing wine when it was sued.

### C.   Cramele Recas and Philip Cox's latest breach.

44.   Now Cramele Recas and Cox have breached the Settlement Agreement and the Stipulated Judgment again.  This time they are selling, not only in the U.S. and this district, but also in other countries around the world, a wine with a blood-stained label and vampire bats with the words, BLOODY MERLOT, from the LAND OF VAMPIRE.  Moreover, under the word MERLOT is a red line—intending to represent an upper lip—with vampire fangs extending downward toward the from "the LAND OF VAMPIRE" portion of the label. (Exhibit 4.)  Other versions of the label say BLOODY MERLOT, from the LAND OF BLOOD SUCKERS.  (Exhibit 5.)  The back labels are likewise blood stained and include "BLOODY MERLOT FROM THE LAND OF THE BLOOD SUCKERS [or VAMPIRES]" depending on the version and "Legend of Transylvania."  (*See* Certificate of Label Approvals obtained by Tri-Vin, Exhibit 6.)

45.   Cramele Recas is also selling a Cabernet Sauvignon version of these wines branded as BLOODY CABERNET, from the LAND OF VAMPIRE and from the LAND OF BLOOD SUCKERS with the same blood-stained label, vampire bats, and red line with vampire fangs under CABERNET.  (Exhibit 7 .)

The BLOODY MERLOT and BLOODY CABRENET are collectively referred to herein as "the Accused Products."

46.     On the back label of the Accused Products is also a QVR code that when scanned shows Vampire bats flying in the air.  As such, defendants are using the word vampire, "blood suckers" an obvious synonym for vampires, vampire bats, "Legend of Translyvania" and other Vampire imagery to sell their wine – all in contravention of the Stipulated Judgment and Settlement Agreement and the trademark laws of the U.S. and California.

47.     Despite knowing that this Court has already determined in the related case that Cramele Recas' use of the words "Dracula's Bloodlust" was found to be a breach of the Stipulated Judgment and Settlement Agreement, Defendant Cramele Recas has once again violated the Stipulated Judgment and Settlement Agreement with the current Accused Products.  Notably, in the related case, the Court found "Dracula Bloodlust" to be a breach of  the Stipulated Judgment and Settlement Agreement despite Philip Cox's ridiculous claim that "Dracula has nothing to do with Vampires or Vampire wine and that Dracula was a historic figure in Romania,"  (See Docket No. 87, page 5, in the related Case 2:06-cv-07793-VBF-JWJ.)

48.     Mr. Cox and Cramele Recas are at it again, this time arguing that it wasn't them that sold the Accused Products (stating "Land Der Vampire") to the Penny's 3500 chain of stores in Europe and arguing that "bloodsucker" (and other vampire imagery and statements) does not mean vampire or suggest that the Accused Products are authorized, sponsored by, endorsed by, or otherwise connected with Plaintiff.

49.     Perhaps in another context, bloodsucker could refer to a leech, but here in the context of the accused products it clearly refers to a "vampire" and Plaintiff's Vampire wines.  Attached as Exhibit 8 are instances downloaded off the

internet showing "bloodsucker" to be synonymous with "vampire."  Here,  the protests of Defendant Recas, as well as the other defendants, that "bloodsucker" is not a reference to a "vampire" is just as disingenuous as Defendant Cramele Recas's prior claim that the use of "Dracula", the most famous vampire of all, had nothing to do with "vampires" or VAMPIRE wine.

50.    Plaintiff via its predecessors has worked with the Wesley Snipes "Blade Trilogy" vampire films, even sponsoring a contest that sent the winner to Transylvania.  Plaintiff's Dracola, a red colored soft-drink, was written into the script of the first of the Blade films as well.  Notably, the use of the term "bloodsucker" is prominent in this series of Vampire Films.  (See Exhibit 9 attached.)

51.    Also, besides Plaintiff using the term "blood" in its branding as in Dracula's Blood Pinot Noir and Dracula's Blood Merlot, reviewers also use the term "blood" or "bloody" to refer to plaintiff's VAMPIRE Family of Brands.  (See Exhibit 10 attached.)  As a result of the foregoing, the likelihood of confusion is also heightened by the inclusion of the vampire imagery on the labels and promotional materials for the Accused Products , including the vampire bats, fangs, and blood drops, and other statements included on the front and back labels of the Accused Products.

**D.    Tri-Vin's Connection to Cramele Recas and Philip Cox's latest breach.**

52.    Defendant Tri-Vin is acting as defendant Cramele Recas's agent and importer for the Accused Products and as such are subject to the terms of the injunction included in the Stipulated Judgment.  Defendant Tri-Vin is importing the Accused Products into the United States.  Sometime in August of this year, they posted an ad for the Accused Products on Facebook, and when asked where it will be available, they answered "everywhere."  When asked in California too, they answered "yes."

53.   Tri-Vin is no stranger to Vampire Wine.  In fact, Tri-Vin was the first large customer of Plaintiff's founder, Michael Machat, for VAMPIRE wine.

54.   From 1995 through approximately 2017, with the exception of a couple of years in the late 2000s, Plaintiff's predecessors in interest sold its Vampire wine to Tri-Vin for Tri-Vin to distribute.

55.   In the early 2000s, when TI Beverage Group switched Romanian producers and began doing business with Cramele Recas, Tri-Vin followed and began its own business relationship with Cramele Recas, importing various non-infringing wines from Cramele Recas over the years.

56.   Just prior to TI Beverage Group suing Cramele Recas in 2006, TI Beverage Group stopped selling VAMPIRE wine to Tri-Vin and began to sell to another distributor in New York, namely Southern Wine & Spirits.

57.   Not long afterwards, Tri-Vin created and began selling Werewolf Wine from Romania, as a thematic replacement to VAMPIRE Wine.  Werewolf was also supplied by Cramele Recas.  Tri-Vin apparently did not care what Werewolf tasted like, but instead just wanted a wine from Transylvania that referenced a European folklore creature and that is often associated with vampires such as in the Underworld  Trilogy.  Their lack of care in the quality showed.

58.   Nevertheless, in or around 2008, for reasons unrelated to this lawsuit, TI Beverage Group and Southern Wine & Spirits relationship soured, and Tri-Vin agreed to become the NY distributor for Vampire once again.

59.   This time around, however, the sourcing of Vampire wine had changed.  In 2007, TI Beverage Group and Machat moved the sourcing of the wine from Transylvania to California, first Paso Robles and ultimately Napa in 2009, to take better control over the brand.

60.   Overnight, the wine quality became much better and consistent compared to when the wine was produced in Romania.  The California based

VAMPIRE wine gets lots of critical acclaim and wins gold medals.  That was not the case with the Transylvania predecessor, although there was a period when VAMPIRE Pinot Grigio won a gold medal, but inexplicable a year later, to save a nickel the winery TI Beverage Group was working with cut the quality.  Such was the frustrating mentality TI Beverage Group had to put up with when sourcing its wine from Romania.

61.     As time went by, it seemed Tri-Vin was improperly attempting to link TI Beverage Group's critically acclaimed VAMPIRE wine with the not so good tasting Werewolf wine from Romania and selling them together.  Wanting to disassociate TI Beverage Group's gold medal winning VAMPIRE brand from Tri-Vin's lesser quality Werewolf wine, in 2017, TI Beverage Group once again switched distributors in New York and stopped selling VAMPIRE wine to Tri-Vin.

62.     Apparently, Tri-Vin have missed selling VAMPIRE wine and now Tri-Vin has unlawfully aided Carmele Recas's breach of the Stipulated Judgment and the Settlement Agreement and conspired with Cramele Recas to produce a confusingly similar product, which has led to this lawsuit.

63.     Plaintiff first came to learn about the Accused Products after Tri-Vin posted an ad on Facebook showing a short video of Vampire bats flying around that followed a picture of the label that says, "BLOODY MERLOT FROM THE LAND OF VAMPIRE."  Plaintiff Vampire Family Brands was alerted to this by someone who thought it was a new offering by Plaintiff.

### E. Subsequent Investigation After Learning of Actual Confusion

64.     After seeing the video showing the wine branded as Bloody Merlot from the Land of Vampire, VFB began conducting internet research into Cramele Recas' activities.  Unfortunately, despite entering into a world-wide agreement not to 1) use the word "vampire" "or any word or words or marks confusingly similar

[thereto], or a colorable imitation [thereof]" in connection with the sale, advertising and/or promotion of beverage products throughout the world, or 2) representing directly or indirectly by words or conduct that any beverage product or beverage accessory offered for sale, sold, promoted, or advertised is authorized, sponsored by, endorsed by, or otherwise connected with VFB, Cramele Recas proceeded to do exactly what it covenanted not to do.

65.   Beginning at a time uncertain, Cramele Recas began selling Wine from the Land of Vampire to Penny, a very large discount chain store in Austria and Germany with approximately 3500 stores.  The German version of the label says "LAND DER VAMPIRE."  It too has the promotional video accessible by scanning the label on the bottle which shows the vampire imagery.  On information and belief, based on Plaintiff's prior business dealings with major supermarket chains and based on Plaintiff's predecessors in interest prior business dealings with Cramele Recas, Plaintiff estimates that Cramele Recas must have sold at least 100,000 bottles to the Penny Supermarket Chain, entitling Plaintiff to at least $130,000 for this sale alone under the liquidated damages clause (calculated at $1 per bottle plus $10,000 per instance for at least three instances corresponding to two merlot vintages and one cabernet vintage.)  (*See* attached article from Meiningers Wine Business International dated October 2018 as Exhibit 11)

66.   Upon information and belief, after seeing the success of the infringing wine in Europe, Cramele Recas offered the same infringing wine to Tri-Vin and its affiliate company, Defendant Bracus, which has the same management as Tri-Vin. As discussed herein, both Cramele Recas and Tri-Vin, having done business with TI Beverage Group for years and both having knowledge about the Stipulated Judgment and Settlement Agreement prohibiting Cramele Recas from 1) using the word "vampire" or any word or words or marks confusingly similar to vampire in connection with the sale, advertising and/or promotion of wine, or 2) representing

directly or indirectly by words or conduct that any beverage product or beverage accessory offered for sale, sold, promoted, or advertised is authorized, sponsored by, endorsed by, or otherwise connected with VFB, proceeded to do just that anyway.   Moreover, on information and belief, as evidenced in part by the differences between the original label used by Defendant Cramele Recas and the second label for which Defendant Tri-Vin sought label approval from the TTB, Defendants Cramele Recas and Tri-Vin had discussions amongst themselves modifying the original Cramele Recas label in an attempt to avoid the Stipulated Judgment and the Settlement Agreement Cramele Recas signed.   Compare for example Exhibit 12, both shelf-talkers created by Defendant Tri-Vin.   Cramele Recas and Tri-Vin's attempt to avoid running afoul of the Stipulated Judgment and Settlement Agreement was feeble and unsuccessful because Defendants kept the vampire branding the same while simply substituting "blood suckers", a known synonym, for the word "vampire" on some labels.

67.    Defendants changed the words "land of vampire" to "land of blood suckers", a clear equivalent, on some bottles of wine imported to the US, but they otherwise left the advertising and promotion materials the same, displaying the vampire imagery and connections.   For example, Defendants' labels and promotional materials also continued to employ "Bloody Merlot" and "Bloody Cabernet" in combination with "FROM THE LAND OF THE BLOOD SUCKERS" and other vampire statements and imagery, including "Legend of Transylvania," vampire bats, vampire fangs, and blood drops.   Moreover, upon information and belief, defendant Tri-Vin and its affiliate Bracus, continued to use the same advertising and promotional materials as before, knowing, but not caring that doing so would violate the Stipulated Judgment and Settlement Agreement they knew existed between TI Beverage Group and Cramele Recas.   For example, the QPR label continued to play the same video.   See also Exhibit 12, two sets of

industry shelf talkers created for retail placement adjacent to bottles of the accused wine, created by defendant Tri-Vin proclaiming the accused product to be a "best value." Accordingly, regardless of Defendants' substitution of "Blood Suckers" for "Vampire" on the bottle labels and related promotional materials of the Accused Products, Defendants' activities continue to breach the Stipulated Judgment and Settlement Agreement, as well as create a likelihood of confusion with Plaintiff's VAMPIRE Family of Brands, particularly in light of Defendants' decision to imitate various aspects of Plaintiff's Vampire branding.

68.     On information and belief, based on Plaintiff's prior business dealings with Defendant Cramele Recas and Tri-Vin, Plaintiff estimates that Cramele Recas must have sold at least 33,600 bottles of the Accused Products to Defendant Tri-Vin, entitling Plaintiff to at least $66,600 for this sale alone under the liquidated damages clause (calculated at $1 per bottle plus $10,000 per instance for at least three instances corresponding to "blood suckers" labels for two merlot vintages and one cabernet vintage.)

69.     Prior to filing the Complaint, a representative of Tri-Vin wrote on its Facebook page that it would be selling the Accused Products everywhere throughout the United States, including California. Specifically, the following written conversation was had via Tri-Vin's Facebook page beginning August 26, 2020, and ending September 3, 2020,  a copy of which appears as Exhibit 13:

Is the "Bloody Merlot land of vampire" sold somewhere?
Yes it is being released on September 1ˢᵗ.
You could find it near you here.



**Bloody Merlot (2018) (R8251) - Tri-Vin Imports, Inc | Wines**
tri-vin.com

Is it just going to be available in NY or will it be elsewhere too?
Everywhere!
In California too?
Yes! I can put you in contact with someone if you want more
information. What is your email address?
Ok, thanks.  It's Lisadominque1@aol.com

70.    The foregoing conversation confirms that Tri-Vin targeted sales of the
Accused Products in California, including in this judicial district. Further, on
information and belief, Defendant Tri-Vin sold thousands of bottles of the Accused
Products to its affiliate and agent in California, Defendant Bracus, with the intent
that Defendant Bracus sell and distribute the Accused Products throughout
California, including in this judicial district, in violation of the Stipulated Judgment
and Settlement Agreement, and Defendant Bracus has done so.

71.    As discussed above, Tri-Vin used to sell VAMPIRE wine for years.  It
used to  tie its Werewolf Wine with plaintiff's VAMPIRE wine and sell them
together to their retail accounts.  Upon information and belief, Tri-Vin's sales of
Werewolf declined when Plaintiff discontinued using Tri-Vin as a distributor of its
VAMPIRE wines because it was unable to associate it with a wine with a
"vampire" theme, so it sought with Defendant Cramele Recas to create one to
replace plaintiff's VAMPIRE wine which it lost the distribution rights to.  In doing
so, defendant Tri-Vin intentionally infringed upon Plaintiff's VAMPIRE wine,
VAMPIRE Family of Brands, and intentionally interfered with the Stipulated
Judgment and Settlement Agreement between Cramele Recas and Plaintiff.

72.    Exhibit 14 downloaded from Greens Wines & Liquors' website at
greenswines.com advertises the Accused Products from the LAND OF VAMPIRE.
The label says "DER VAMPIRE" but the text written by the  retailer says:

"This Merlot from the land of the vampires is gentle, fruity, and juicy. His
label is alive. Try it."

Naturally Defendants provided this infringing advertisement to Greens Wines & Liquors.

73.    Similarly, Exhibit 15 downloaded from winestyleonline.com shows a similar infringing advertisement that would have been provided to Winestyle by defendants.

74.    Also, Exhibit 16 download off of Vivino.com shows the infringing LAND OF VAMPIRE label.  Vivino is a website in which consumers upload a picture of a wine and then rate it.

75.    These instances are in addition to defendants use of LAND OF VAMPIRE on defendant Tri-Vin's Facebook page that led to at least one instance of actual confusion as to source of origin.    That person actually assumed defendants' LAND OF VAMPIRE product was one belonging to Plaintiff.    This was a natural assumption because Plaintiff uses the word 'VAMPIRE', 'DRACULA', and other vampire imagery in its numerous brand offerings as described above.

76.    To be clear, all Defendants have used and use "LAND OF VAMPIRE" in connection with both their BLOODY MERLOT and BLOODY CABERNET in the U.S.

77.    The confusion is further heightened by the fact that Plaintiff has sold wine under the brand DRACULA'S BLOOD MERLOT and DRACULA'S BLOOD PINOT NOIR.    Plaintiff still has some of this product in inventory.  Plaintiff noticed that its own warehouse and staff would often confuse its DRACULA PINOT NOIR from Carneros, Napa with the less expensive DRACULA'S BLOOD PINOT NOIR and sometimes ship the expensive Napa Valley pinot noir instead of the less expensive DRACULA'S BLOOD.    A simple internet search on Bing for the terms "bloody merlot land of the vampires" brings up numerous images of Plaintiff's products, including Plaintiff's DRACULA'S

BLOOD wines, images of Plaintiff's VAMPIRE wines in conjunction with a picture of the actor Kate Beckinsale who stars in the Underworld vampire film series in which Plaintiff ran more than one competition, and other pictures of Plaintiff's VAMPIRE wine.  Please see  Exhibit 17.

78.    Defendants' use of "blood" also causes confusion with Plaintiff's use of "blood" on the blood drop hanging off the V in each bottle of Plaintiff's VAMPIRE wine and on the drops of blood Plaintiff uses in connection with its sangria, which it calls FANGRIA.

79.    Additionally, Defendants use of "blood" also causes confusion with Plaintiff's red colored version of VAMPYRE VODKA with the red meant to simulate blood.

## F.    More background on Plaintiff and VAMPIRE Wine.

80.    Plaintiff markets its brands through a national network of wholesalers, and via the website: www.vampire.com.   VAMPIRE wine sells for anywhere between $10 to $15 per bottle nationally at retail stores.  VAMPIRE wine is also available in bars and restaurants on wine lists.

81.    Plaintiff and its associates have worked hard to ensure that they put the best wine in the bottle as possible.   Over the last few years, Plaintiff's VAMPIRE family of wines have received some great reviews and have won Gold Medals, including Gold Medals at the San Francisco Chronical Wine Competition for its VAMPIRE Merlot, VAMPIRE Cabernet Sauvignon, VAMPIRE Pinot Noir, a Gold Medal and 92 Rating from the Los Angeles International Wine & Spirits Competition awarded to VAMMPIRE Cabernet Sauvignon, Gold Medals at the Texas International Rodeo Wine Competition, and 92 and 97 ratings for its highest end TRUEBLOOD Cabernet Sauvignon.  Defendant Cramele Recas, on the other hand, takes no care to ensure that its wine is a premium wine; quite the opposite its business model is to make as much wine as possible irrespective of how it tastes.

Defendant's Bloody Merlot is undrinkable from an aesthetic standpoint.  It won't make one sick, but there's no point in drinking it when there are so many other good tasting wines on the market.  Defendant Cramele Recas takes pride on being the largest Romanian wine producer, but it takes no pride in the wine it produces.

82.     Plaintiff has spent substantial amounts of time and money building up, advertising, and promoting its brands.  By virtue of the popularity of its brands, its advertising, promotion, and sales, plus the popularity of its websites, including vampire.com, Plaintiff has built up and owns extremely valuable goodwill which is symbolized by Plaintiff's various VAMPIRE Family of Brands.

83.     Each of the Defendants knew of Plaintiff's VAMPIRE Family of Brands, including VAMPIRE wine, but decided to go ahead with their plans to advertise, market and sell wine bearing the word Vampire or suggesting Vampire anyway, because they believed that they could get away with it and they wanted to make easy money capitalizing on Plaintiff's built-up goodwill over the years.

84.     If Defendants are not stopped from marketing wine with a name such as Vampire or making obvious references to Vampire then consumers will be confused as to the source of origin of defendants' confusingly similar wine.

85.     Also, if defendants are not stopped from marketing wine with Plaintiff's VAMPIRE mark or a name obviously suggesting Plaintiff's Vampire mark and VAMPIRE Family of Brands, it is likely that consumers will become confused about the source and origin of Plaintiff's products, and/or confused about the source and origin of Defendants' Accused Products and mistakenly conclude that Defendants' Accused Products are produced by or otherwise associated with Plaintiff, harming Plaintiff's reputation for producing really good wine.

## COUNT I

## BREACH OF CONTRACT
### (Against Cramele Recas and Does 1 – 10)

86.   Plaintiff repeats each allegation contained in paragraphs 1 through 85 as though set forth herein at length.

87.   A copy of the Stipulated Judgment in the case entitled *TI Beverage Group, LTD v S.C. Cramele Recas S.A. et al* in Case No. CV-06-7793 VBF is attached as Exhibit 1 to this Complaint.   As discussed above, the Stipulated Judgment is also part of the Settlement Agreement, which is a contract agreed to by TI Beverage Group and Cramele Recas and Philip Cox.   Vampire Family Brands is the assignee of TI Beverage Group.

88.   As described above, in addition to violating a Court Order, Cramele Recas and Philip Cox and their agents breached Paragraph I.A.1. of the Settlement Agreement by:

> (i)  Using the word Vampire in connection with the sale of beverages;

> (ii) Using the word Vampire in connection with the advertising of beverages;

> (iii) Using the word Vampire in connection with the promotion of beverages;

> (iv) Using other words (such as BLOOD SUCKERS) which are confusingly similar to or a colorable imitation of vampire in connection with the sale of beverages;

> (v)  Using other words (such as BLOOD SUCKERS) which are confusingly similar to or a colorable imitation of vampire in connection with the advertising of beverages;

> (vi)  Using other words (such as BLOOD SUCKERS) which are confusingly similar to or a colorable imitation of vampire in connection with the promotion of beverages;

89.     As discussed herein, Defendant Cramele Recas's acts also constitute a breach of the following provision in the Stipulated Judgment and Settlement Agreement :

> c.     Representing directly or indirectly by words or conduct that any beverage product or beverage accessory offered for sale, sold, promoted, or advertised by any of the RECAS parties, is authorized, sponsored by, endorsed by, or otherwise connected with any of the TI parties.

90.     As a result of all the breaches to the Stipulated Judgment and Settlement Agreement, Plaintiff asks that this Court order Defendant Cramele Recas to pay as damages, Plaintiff's lost profits, calculated by multiplying Plaintiff's average profit per bottle of wine times the total number of Accused Products sold by defendants.

91.     In addition, and/or in the alternative, Plaintiff seeks recovery of all sums paid to defendants and each of them for sales of the accused product.

92.     In addition, and/or in the alternative, Plaintiff seeks its liquidated damages of $10,000 per incident plus $1 per bottle sold.  Plaintiff reserves the right to make its election of remedies closer to the time of trial.

93.     Plaintiff also seeks its Attorney Fees and Costs as provided for in the Settlement Agreement.

# COUNT II

# BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

**(Against Cramele Recas and Does 1 – 10)**

---

94.     Plaintiff repeats each allegation contained in paragraphs 1 through 93 as though set forth herein at length.

95.     The Contract contains a covenant implied by law that Defendant Cramele Recas and each of them will act toward Plaintiffs in good faith and fair dealing.

96.     The implied covenant of good faith and fair dealing imposes upon Defendant Cramele Recas the duty not to take any action with the motive to frustrate Plaintiff's enjoyment of rights under the Stipulated Judgment and Settlement Agreement.

97.     Unfortunately, Defendant Cramele Recas has done just what the covenant of good faith and fair dealing prohibits it from doing by taking action designed to frustrate Plaintiff's enjoyment of rights under the Stipulated Judgment and Settlement Agreement.

98.     Defendants collectively conspired to utilize Plaintiff's VAMPIRE mark on beverage products by selecting a term (i.e. BLOOD SUCKER, as used in "FROM THE LAND OF BLOOD SUCKERS") to attempt to frustrate Plaintiff's enjoyment of rights under the Contract.

99.     Defendant Cramele Recas's improper use of words and images in selling, advertising and promoting the Accused Products, as described herein, amounts to a violation of the covenant of good faith and fair dealing.

## COUNT III

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Tri-Vin And Does 11 - 20)

100.    Plaintiff repeats each allegation contained in paragraphs 1 through 99 as though set forth herein at length.

101.    Defendant Tri-Vin knew that Plaintiff had a contractual relationship

with Cramele Recas and intentionally interfered with that relationship. Tri-Vin's conduct prevented and interfered with Plaintiff from enjoying the benefits of the Stipulated Judgement and Settlement Agreement that its predecessor in interest made with Cramele Recas. Tri-Vin's acts and omissions were intentional and done knowing that they would be disrupting and interfering with Plaintiff's business in California and elsewhere.

102. As a result of Tri-Vin's wrongful acts and omissions, Plaintiff has been damaged in a sum to be proven at trial but is estimated to be at least One Hundred Fifty Thousand Dollars. Defendant Tri-Vin's acts of interference with Plaintiff's contract with Cramele Recas were done intentionally to deprive the Plaintiff of property, legal rights or to otherwise cause injury, such as to constitute malice or oppression under California Civil Code Section § 3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or set an example of Defendant Tri-Vin.

## COUNT IV

## VIOLATION OF LANHAM ACT 15 U.S.C. §1114

### (Against All Defendants)

103. Plaintiff repeats each allegation contained in paragraphs 1 through 102 as though set forth here at length.

104. Plaintiff and its predecessors in interest long have used the word "blood" and images of blood in their marketing, beginning with the slogan, "Sip the Blood of the Vine," a registered trademark that Machat first used in 1988.

105. In 1997 or 1998, Plaintiff's predecessors in interest first began to market its products with a drop of blood hanging off the end of the letter V (for Vampire). Plaintiff owns an incontestable trademark for this image – US Trademark Registration Number 4196305.

106.   So defendants use of blood and blood images and vampire bats, in conjunction with the word "vampire" or colorable imitations of "vampire" such as "blood sucker," in connection with wine is similarly confusing to VFB'S REGISTERED MARKS.  Defendants have committed trademark infringement of Plaintiff's trademarks in their deceptive marketing of wine, using VAMPIRE or other similarly confusing names.

107.   Defendants have induced others to infringe VFB'S REGISTERED MARKS.

108.   Defendants have acted with bad intent and culpably in selecting using, and/or approving of the use of Plaintiff's REGISTERED MARKS and other words and/or images in the distribution, marketing, promotion, advertisement, offering for sale, and/or sale of wine.

109.   Without the knowledge or consent of Plaintiff, Defendants have marketed and sold in interstate commerce, and in commerce substantially affecting interstate commerce, beverage products branded under the VAMPIRE mark or other similarly confusing names, and continue to do so.   Defendants have promoted, advertised, offered for sale, and/or sold, beverage products using the VAMPIRE mark through persons not authorized, employed by, or associated in any way with Plaintiff and have used the aforementioned trade names and trademarks as false designation and false representation for beverages.

110.   None of the Defendants activities alleged in this complaint related to the Accused Products have been authorized by Plaintiff, and such unauthorized use by Defendants of VFB's REGISTERED MARKS in interstate commerce, commerce substantially affecting interstate commerce in this district, and elsewhere throughout the United States, constitutes infringement and an inducement to infringe Plaintiff's trademarks and/or trade names, and such activities are likely to cause confusion, mistakes, and to deceive the public at large.

111.   Upon information and belief, Defendants have acted with the unlawful purpose of:

      a. Improperly taking advantage of the valuable goodwill belonging to Plaintiff;

      b. Soliciting Plaintiff's customers and/or potential customers, attempting to sell, and selling to such customers and potential customers, beverages marketed under the VAMPIRE mark and other confusingly similar names to Vampire through persons not authorized by, employed by, or associated in any way with Plaintiff;

      c. Inducing others to infringe Plaintiff's trademarks and trade names; and

      d. Causing the goods of persons not authorized by, employed by, or associated in any way with Plaintiff to be falsely represented as if they were rendered, authorized, sponsored by, endorsed by, or otherwise connected with Plaintiff and its licensed trademarks and trade names.

112.   Defendants' conduct, as alleged in this complaint, constitutes a violation of 15 U.S.C. § 1114.

113.   If Defendants are allowed to continue marketing and selling the Accused Products, Plaintiff  will be damaged as alleged in this complaint, and the Defendants will profit thereby.  Furthermore, unless the Court permanently enjoins Defendants' conduct as alleged in this complaint, Plaintiff's business, goodwill, and reputation will suffer irreparable injury of an insidious and continuing sort that cannot be adequately calculated and compensated in monetary damages.

114.   Defendants' aforementioned acts and conduct is being done

willfully and with an intent to ride on, and/or step on and demolish, the goodwill Plaintiff has worked hard to develop.   Plaintiff is therefore entitled to treble damages arising therefore, as well as reimbursement of Plaintiff's attorneys' fees and costs.

115.   The intentional nature of defendants' acts makes this an exceptional case under 15 U.S.C. §1117(a).

116.   The intentional nature of defendants' acts and conduct makes this a case suitable for an award of Three Times Defendants' profits.   Further Defendants' acts of trademark infringement were done intentionally to deprive the Plaintiff of property, legal rights or to otherwise cause injury, such as to constitute malice or oppression under California Civil Code Section § 3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or set an example of Defendants.

**COUNT V**

**VIOLATION OF LANHAM ACT 15 U.S.C. §1125(a)**
**(Against All Defendants)**

117.   Plaintiff repeats each allegation contained in paragraphs 1 through 116 as though set forth here at length.

118.   Defendants have engaged in, and continue to engage in, the wrongful exploitation of Plaintiff's  VAMPIRE Family of Brands.

119.   For example, at one point, Plaintiff's predecessors in interest were actively selling a Romanian wine called DRACULA'S BLOOD, for which it has common law trademark rights.   Plaintiff still has inventory of this product. Unfortunately, even the people that worked for Plaintiff's predecessors in interest got confused between Plaintiff's Napa Carneros DRACULA Pinot Noir (which retails for approximately $35) with the far less expensive DRACULA'S BLOOD

Pinot Noir.   Occasionally the warehouse would ship the expensive Carneros DRACULA Pinot Noir instead of the less expensive DRACULA'S BLOOD.  See Exhibit 18.

120.   As previously mentioned, the etymology for sangria is bloodletting. Plaintiff's promotional materials for FANGRIA feature illustrations of vampires, bats and blood. See Exhibit 19.

121.   Also, Plaintiff's Vampyre Vodka is blood red.  One of the attributes that many like about it is that there is so much red coloring that it turns your lips red, so people know if someone's been drinking it.  Defendants' use of vampire imagery, including blood and illustrations of blood, vampire bats, fangs, and the slogan "Legend of Transylvania" infringe VFB's COMMON LAW MARKS.

122. Defendants' goods are so closely related to Plaintiff's goods that the public is likely to be confused, to be deceived, and to erroneously assume that Defendants' marketing and sale of their wine as packaged, advertised and promoted, are those of Plaintiff, or that Defendants are in some way connected with, sponsored by, or affiliated with Plaintiff, all to Plaintiff's detriment and irreparable damage.

123.   Defendants are not affiliated with, connected with, endorsed by, or sponsored by Plaintiff.  Furthermore, Plaintiff has not approved any of the goods or services offered or sold by the Defendants.

124.   Defendants' aforesaid infringing conduct has been willful and with an intent to ride on, and/or step on and demolish, the goodwill Plaintiff has worked hard to develop.  Defendants' aforesaid infringing conduct has been willful and with knowledge that the sale, marketing, advertisement, and promotion of their Accused Products will hurt the prospects of future commercial success of Plaintiff's VAMPIRE Family of Brands, including its VAMPIRE and DRACULA wines.  Plaintiff is therefore entitled to treble damages arising therefore, as well as

reimbursement of Plaintiff's attorneys' fees and costs.  Further Defendants' acts of unfair competition under 35 U.S.C. § 1125(a) were done intentionally to deprive the Plaintiff of property, legal rights or to otherwise cause injury, such as to constitute malice or oppression under California Civil Code Section § 3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or set an example of Defendants.

### COUNT VI

### VIOLATION OF LANHAM ACT 15 U.S.C. §1125(c)
**(Against All Defendants)**

125.   Plaintiff repeats each allegation contained in paragraphs 1 through 124 as though set forth here at length.

126.   Defendants have engaged in, and continue to engage in, the wrongful exploitation of Plaintiff's registered Vampire family of  marks, including its VAMPIRE wine.

127.   In addition to the connection to the Wesley Snipes Blade Trilogy of Vampire films, Plaintiff's VAMPIRE wines and related Vampire Family of Brands have appeared on The View, Anderson Cooper, CNN Headline News, Entertainment tonight, MTV's Viva La Bam, The Food Channel, A & E, and have been written up in widely circulated magazines such as Star Magazine, Shape, Maxim, InStyle, Elle, Spin, Rolling Stone, Marie Claire,  Cosmo Girl, The Wine Enthusiast, and in regional newspapers such as the LA Times, the NY Times, the Houston Chronicle, and others, and as such have developed a fame all of their own catapulting the VAMPIRE brand into the category of a famous mark.

128.   Plaintiff fears that defendants' improper use of "From the Land of Vampire", From the Land of Bloodsuckers", "Legend of Transylvania", and other efforts to associate its Accused Products with "vampires" will cause consumers to believe that Plaintiff's VAMPIRE branded wines (and other goods and services,

*including its tacos*) are not of as high quality as they actually are and will tarnish, dilute and otherwise damage the reputation of Plaintiff's goods and services. This will lead to irreparable harm to Plaintiff's goodwill, reputation, and sales.

## COUNT VII

### UNFAIR COMPETITION – COMMON LAW, AND CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 et seq.

### (Against All Defendants)

129.   Plaintiff repeats each allegation contained in paragraphs 1 through 128 as though set forth herein at length.

130.   Defendants has engaged in unfair competition perpetrated against Plaintiff by reason of the conduct alleged herein.

131.   The unlawful and unfair conduct is injuring the goodwill of Plaintiff.

132.   Defendants are each liable for the unfair competition, and/or are liable for aiding and abetting such conduct.

133.   By this conduct, Plaintiff  has directly suffered injuries and each Defendant has been unjustly enriched.

134.   Plaintiff is entitled to restitution, the recovery of damages, and the recovery of the profits earned by Defendants by virtue of their conduct.

135.   As a consequence of the unfair competition by Defendants, Plaintiff is suffering irreparable injury, by reason of which such conduct should be enjoined.

136.   Plaintiff is entitled to reasonable attorneys' fees.

137.   Plaintiff is informed and believes, and on that basis allege, that the aforementioned conduct of Defendants is willful, oppressive, fraudulent, and malicious, and Plaintiff is therefore entitled to punitive damages.

# COUNT VIII

## UNFAIR COMPETITION – COMMON LAW, CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17500 et seq.

### (Against All Defendants)

138.  Plaintiff repeats each allegation contained in paragraphs 1 through 137 as though set forth here at length.

139.   Defendants' use of the trade names and trademarks VAMPIRE and similarly confusing names, such as BLOOD SUCKERS, "LEGEND OF TRANSYLVANIA", and various vampire imagery employed on its label and promotional materials, misrepresents the nature, characteristics, identity, and source or sponsorship of Defendants' goods, constitutes aiding and abetting liability for deceptive, untrue, and misleading advertising and therefore constitutes a violation of, inter alia, California Business and Professions Code §§17500 et seq. and California common law.

140.   Defendants' use of the trade name and trademark VAMPIRE and similarly confusing names, such as BLOOD SUCKERS, "LEGEND OF TRANSYLVANIA", and various vampire imagery employed on its label and promotional materials, misrepresents the source of Defendants' goods, and are likely to deceive and will continue to deceive the consuming public. Defendants knew, recklessly disregarded, or reasonably should have known that such packaging, advertising, marketing, and promotion was untrue and/or misleading.

141.   As a result of the conduct described above, Defendants have been and/or will be unjustly enriched at the expense of Plaintiff and the general public. The interests of the general public and Plaintiff are, therefore, closely related.

142.   Defendants have been unjustly enriched, among other things, by the

receipt of sales revenues from consumers who mistakenly thought that they were purchasing Plaintiff's VAMPIRE Family of Brands branded alcohol-beverage products or accessories, but instead were purchasing Defendants' goods which are promoted and sold through advertisements that affirmatively misrepresent, either directly or by implication, the nature, characteristics, identity, and source or sponsorship of the goods.

143.   Pursuant to Business and Professions Code §§ 17203 and 17535, Plaintiff, on behalf of itself and the general public, which is unable effectively to assert its interests, seeks an order of this Court ordering Defendants immediately to cease such support for acts of unfair competition and false advertising, and enjoining Defendants from continuing to import or export, distribute, market, promote, advertise, offer for sale, and sell, Defendants' Accused Products or any other beverage and/or beverage accessory products that contain any of Plaintiff's VAMPIRE Family of Brands (or names or marks confusingly similar to Plaintiff's VAMPIRE Family of Brands) which falsely advertise or conduct business via the unlawful, deceptive, unfair or fraudulent business acts and practices, and the untrue and misleading advertising complained of herein.  Plaintiff additionally requests an order disgorging Defendants' ill-gotten gains and restitution of all monies wrongfully acquired by Defendants by means of their support of such acts of unfair competition and false advertising, damages, interest and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment as follows:

1.   That the Court adjudge and decree that Defendants have falsely designated the origin of certain beverage products as those of Plaintiff, have made and used false representations in connection with the sale, offering for sale, promotion and advertising of such products, and have unfairly competed with

Plaintiff at common law.

2.     That the Court adjudge and decree that Defendants have infringed Plaintiff's registered trademarks, including that for VAMPIRE.

3.     That the Court permanently enjoin Defendants, its agents, servants, employees, attorneys, and all persons acting in concert or participation with them, or with any of them from:

a.  Using VAMPIRE, BLOOD SUCKER, BLOOD or BATS or DRACULA, or any other word or words which are similar to, or a colorable imitation of, Plaintiffs' trade names and marks, (including VAMPIRO or  Vlad Tepes) either alone, as part of, or together with, any other word or words, trademark, service mark, trade name, or other business or commercial designation in connection with the sale, offering for sale, advertising, and/or promotion of beverage products and beverage accessories;

b.  Selling, offering to sell, marketing, distributing, advertising and/or promoting any BEVERAGE product or BEVERAGE accessory or label with the words VAMPIRE, BLOOD SUCKER, BLOOD, BATS or DRACULA displayed on the product, its packaging, advertising or promotional materials;

c.  Representing directly or indirectly by words or conduct that any beverage product or beverage accessory offered for sale, sold, promoted, or advertised by Defendants, is authorized, sponsored by, endorsed by, or otherwise connected with Plaintiff;

d.  Aiding or abetting in unfair competition against Plaintiff;

e.  Aiding or abetting in false advertising; and

f.   Inducing others to engage in any of these aforementioned acts.

4.     That the Court award an amount to be determined at trial but at least an amount equivalent to treble the amount of Defendants' illicit profits or Plaintiff's lost profits, whichever is greater.

5.     That the Court award an additional amount to be determined at trial sufficient to cover the costs of prospective corrective advertising, which amount is requested to be at least ten times the amount of advertising dollars spent by defendants.

6.     That the Court decree that the intentional nature of defendants' acts and conduct makes this a case suitable for an award of Three Times Defendants' profits.

7.     Punitive and exemplary damages in an amount in excess of $2,000,000.

8.     That the Court, pursuant to the Settlement agreement, Order Cramele Reccas and Philip Cox  to pay $10,000 per incident plus $1 a bottle of Accused Products sold, giving Plaintiff the option to forego the liquidated damages and seek the full extent of damages, if it chooses.

9.     That the Court decree that the intentional nature of defendants' acts makes this an exception case under 15 U.S.C §1117(a).

1       10.    That the Court award Judgment against Defendants for the full costs

2   of this action, including the attorney's fees reasonably incurred by Plaintiff.

3

4       11.    That the Court Order such other, further and different relief as the

5   nature of this action may require and as the Court may deem just and proper.

6

7       12.    That the Court retain jurisdiction of this action for the purpose of

8   enabling Plaintiff, in its discretion, to apply to this Court at any time for such

9   further orders and directions as may be necessary or appropriate for the

10  interpretation or execution of any Order entered in this action, for the modification

11  of any such Order, for the enforcement of compliance therewith, and/or for the

12  punishment of any violation thereof.

13

14

15                             Respectfully submitted,

16  Dated:  February  15 , 2021          By: /s/Michael Machat

17                      Michael Machat, Esq. (SBN 109475)

18                      michael@machatlaw.com
                        **MACHAT & ASSOCIATES, P.C.**

19                      8730 W. Sunset Blvd., Suite 250

20                      West Hollywood, California 90069
                        Tel.: (310) 860-1833

21

22                      David A. Randall (SBN 156722)

23                      dave@hdmnlaw.com
                        Ehab Samuel (SBN 228296)

24                      esamuel@hdmnlaw.com

25                      **HACKLER DAGHIGHIAN**
                        **MARTINO & NOVAK P.C.**

26                      10900 Wilshire Blvd., Suite 300
                        Los Angeles, CA 90024

27

28

Tel.: (310) 887-1333
Fax: (310) 887-1334

Attorneys for Plaintiff
Vampire Family Brands, LLC

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury on all issues raised by the Complaint.

Respectfully submitted,

Dated:  February 15 , 2021          By:/s/Michael Machat

Michael Machat, Esq. (SBN 109475)
michael@machatlaw.com
MACHAT & ASSOCIATES, P.C.
8730 W. Sunset Blvd., Suite 250
West Hollywood, California 90069
Tel.: (310) 860-1833

David A. Randall (SBN 156722)
dave@hdmnlaw.com
Ehab Samuel (SBN 228296)
esamuel@hdmnlaw.com
HACKLER DAGHIGHIAN MARTINO
& NOVAK P.C.
10900 Wilshire Blvd., Suite 300
Los Angeles, CA 90024
Tel.: (310) 887-1333
Fax: (310) 887-1334

Attorneys for Plaintiff