Michael Machat, Esq. SB#109475
MACHAT & ASSOCIATES, P.C.
8730 W. Sunset Blvd., Suite 250
West Hollywood, California 90069
Telephone: (310) 860-1833
Email:  michael@machatlaw.com

David A. Randall (SBN 156722)
dave@hdmnlaw.com
Ehab Samuel (SBN 228296)
esamuel@hdmnlaw.com
HACKLER DAGHIGHIAN MARTINO & NOVAK P.C.
10900 Wilshire Blvd., Suite 300
Los Angeles, CA 90024
Tel.: (310) 887-1333
Fax: (310) 887-1334

Attorneys for Plaintiff
Vampire Family Brands, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| VAMPIRE FAMILY BRANDS, LLC, | CASE NO. 2:20-cv-08223-VBF-PVC |
| Plaintiff, | Related Case:  2:06-cv-07793-VBF-JWJ |
| vs. | **VAMPIRE FAMILY BRANDS, LLC'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS [DKT No's 34 and 36]** |
| S.C. CRAMELE RECAS, S.A., TRI-VIN IMPORTS, INC, BRACUS IMPORTS LLC and DOES 1 – 20, | |
| Defendants. | **DECLARATION OF MICHAEL MACHAT WITH EXHIBITS CONCURRENTLY FILED.** |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................1

II.   FACTUAL BACKGROUND.......................................................4

III.  LEGAL STANDARD. ................................................................6

IV.  ARGUMENT................................................................................6

    A.    Defendants' Defense that VFB has Failed to Join and Indispensable Party is Moot. ........................................................6

    B.    VFB has already agreed to dismiss its dilution claim, i.e., Count VI, and does not contest this claim................................................7

    C.    VFB Agreed to delete the last sentence in Counts IV and V, which make a request for punitive damages for VFB's Lanaham Act claims; Defendants failed to meet and confer on the propriety of any other allegations regarding punitive damages and thus Defendants improper motion should be denied. ......................................................7

    D.    Of course there is a likelihood of confusion between VFB's VAMPIRE mark and Defendants' use of both "Land of Vampires" and "Land of Bloodsuckers." ..............................................8

        (1)    Strength of the Plaintiff's Mark ...............................10

        (2)    Proximity of the Goods............................................11

        (3)    Similarity of the Marks ............................................12

        (4)    Actual Confusion ....................................................13

        (5)    Marketing Channels Used.........................................14

        (6)    Type of Goods and Degree of Care Likely to Be Exercised by the Purchaser ..........................................................15

        (7)    Defendants' Intent in Selecting the Mark ..................15

        (8)    Likelihood of Expansion of the Product Lines ...........16

(9)     Likelihood of Confusion Overall ...............................................17

E.     The Count for Breach of the Covenant of Good Faith and Fair Dealing Has Been Properly Pled........................................................................17

F.     The Balance of Defendants' Arguments equally lack merit. ..............19

V.     IN THE EVENT THIS COURT FINDS ANY PART OF THE COMPLAINT LACKS REQUIRED ALLEGATIONS, VFB ASKS FOR LEAVE TO AMEND        20

VI.     CONCLUSION.............................................................................20

# TABLE OF AUTHORITIES

## CASES

*AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979) ..................... 10, 12, 16

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)..............6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ...............................................................................................................6

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999)....................................................................................................... passim

*Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal.App.3d 1371 (1990) .................................................................................................18

*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342 (1992)................................................................................17

*Celador Int'l Ltd. v. Walt Disney Co.*, 347 F.Supp.2d 846 (C.D. Cal. 2004) .........18

*Chang v. Chen,* 80 F.3d 1293 (9th Cir. 1996) ........................................20

*Cobb v. Ironwood Country Club*, 233 Cal.App.4th 960 (2015) ............................17

*Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118 (9th Cir. 2006)............................................................................................9

*Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998) ..................................................................................... 10, 12

*Duff v. Engelberg*, 237 Cal.App.2d 505 (1965)....................................8

*Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135 (9th Cir. 2002) ................ 13, 15

*Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)..........6

*Getty Petroleum Corp. v. Island Transp. Corp.*, 862 F.2d 10 (2d Cir. 1988), cert. denied, 490 U.S. 1006, 104 L. Ed. 2d 157, 109 S. Ct. 1642 (1989) ......................8

*Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d 1156 (N.D. Cal. 2011).............14

*Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317 (2000) ...........................................................18

*IV Sols., Inc. v. Connecticut Gen. Life Ins. Co.*, No. cv 13-9026-GW(AJWX), 2014
   WL 12603215 (C.D. Cal. Mar. 27, 2014) ............................................................18

*Jackson v. Carey,* 353 F.3d 750 (9th Cir.2003) ...........................................................13

*Longest v. Green Tree Servicing LLC*, 74 F.Supp.3d 1289 (C.D. Cal. 2015) .........18

*Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 76
   U.S.P.Q.2d 1852 (2d Cir. 2005) ........................................................................19

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (9th Cir. 2008) .........6

*Monster Energy Co. v. Integrated Supply Network, LLC*, 821 Fed. Appx. 730 (9th
   Cir. 2020)...............................................................................................................8

*Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074 (9th Cir. 1990) ...........20

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ...........................................................6

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137 (9th Cir.
   2011)................................................................................................... 11, 13

*Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035 (9th Cir. 2010) .......6

*Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625 (9th Cir. 2005)............ 9, 15

*Well Care Pharmacy II, LLC v. W' Care, LLC*, No. 2:13-CV-00540-GMN, 2013
   WL 3200111 (D. Nev. June 24, 2013) ................................................................12

*Yang v. DTS Financial Group*, 570 F.Supp.2d 1257 (S.D. Cal. 2008) ...................13

## **STATUTES**

15 USC § 1114 ...............................................................................................................9

15 USC § 1125 ...............................................................................................................9

## **RULES**

Fed. R. Civ. P. 15(a) ...................................................................................................20

Plaintiff Vampire Family Brands, LLC ("VFB") hereby files this consolidated Opposition to the Motion to Dismiss (Dkt. 34) of Defendants Tri-Vin Imports, Inc. ("Tri-Vin") and Bracus Imports LLC ("Bracus") and the Motion to Dismiss (Dkt. 36) of Defendant Cramele Recas, S.A. ("Cramele Recas").

## I.  INTRODUCTION

Defendant Cramele Recas has constructed an alternative set of facts simply to attempt to get out of the Contract it entered into and avoid contempt of court regarding, *inter alia*, its failure to resist using the word vampire— anywhere in the world[1]—in connection with beverages.  Cramele Recas falsely denies it has used the word "vampire" and it falsely denies that the term "bloodsucker" in the context of wine from Transylvania, marked as "Bloody Merlot" and "Bloody Cabernet" "from the land of the bloodsuckers" and including various vampire imagery is simply another word for "vampire"—a word they contracted (and were ordered by the Court) to never use again in connection with beverages.

A great deal of each defendants' motion to dismiss is simply wasted words written as a result of the defendants filing their motions to dismiss prior to adequately meeting and conferring.  As all defendants note, Plaintiff VFB did offer to voluntarily dismiss Count VI for dilution—not because it was not adequately pled or cannot be adequately pled, but rather because with all the other counts in the complaint, it is not needed for VFB to achieve its litigation goals of getting defendants to stop and pay the money owed because of the breach and contempt of court.  Yet Defendants refused to permit VFB to amend, choosing instead to raise the issue with the Court.  Machat Decl. ¶ 7.

---

[1] Defendant Cramele Recas agreed to a world-wide injunction prohibiting it from ever using the word "vampire" and obtained very substantial consideration in exchange for this promise.

Similarly, Plaintiff informed defendants Tri-Vin and Bracus, prior to their filing their motions that VFB agreed to delete the sentences referring to "punitive damages" in Counts IV and VI of the First Amended Complaint ("FAC") and those two sentences should be stricken, as the claim for punitive damages applies to the State law claims and not the federal trademark claims.  It was properly included however, in Count III for Intentional Interference with Contractual Relations and Count VII for Unfair Competition under State law.  Yet, again Defendants refused to permit VFB to amend.  *Id.* at ¶ 7.  Moreover, Defendants' Tri-Vin and Bracus only met and conferred on Plaintiff's punitive damages allegations with respect to Plaintiff's Lanham Act claims, namely Counts IV and V as Plaintiff already agreed to drop Count VI, and Defendant Cramele Recas did not meet and confer at all with respect to the issue of punitive damages.  *See* Machat Decl. ¶ 7, Exhibits 2 and 3.  Now, however, the Defendants are collectively attempting to strike punitive damages allegations from Counts III through VII (*see* Dkt. 34-1 at 18-20 and Dkt. 36 at 18-19), while having never even attempted to meet and confer on counts III or VII.  Machat Decl. ¶ 7, Exhibits 2 and 3.  Not only are VFB's punitive damages allegations in Counts III and VII proper, but given the Defendants complete failure to meet and confer on any alleged impropriety of VFB's punitive damages allegations in Counts III and VII as required under L.R. 7-3, Defendants Motions should be denied as to those Counts without further consideration.

As far as defendants' claim that VFB has failed to join an indispensable party, that too has been needlessly briefed, as promptly after being informed of the issue, VFB resolved the matter.  Whatever joinder issue might have existed, has been cured; VFB is now the sole owner and registrant of all the asserted marks.  Machat Decl. ¶ 4, Exhibit 1.

Regarding the counts for trademark infringement, defendants seem to confuse the standards applicable to a motion to dismiss with the standards for

summary judgment. Defendants also apply a likelihood of confusion analysis as if VFB does not own the trademark for VAMPIRE wine. As a result, defendants' arguments as to confusion are hopelessly flawed.

In truth, VFB has more than adequately pled its claims for trademark infringement. This is not a motion for summary judgment, and even if it were, issues of likelihood of confusion are rarely decided on summary judgment as the issues tend to be factually intensive and more suited for a jury to decide than a judge.

Cramele Recas's argument regarding VFB's count for breach of the covenant of good faith and fair dealing misconstrues the nature of the claim—failing to understand that this is an alternative cause of action to breach of contract. The purpose of the claim is to prevent injustice by granting plaintiffs an alternative claim to pursue when a contracting party acts in bad faith and unfairly to avoid the strict terms of a contract. A claim for a breach of covenant of good faith and fair dealing is by its very nature an alternative claim to breach of contract. A party is entitled to plead both claims and need not choose one or the other.

Finally, Cramele Recas' claim that subject matter jurisdiction is dependent on the trademark claims ignores the stipulated judgment—based on a trademark claim – that set off the chain reaction leading to this lawsuit. Cramele Recas agreed to the continual jurisdiction of this Court to enforce the Judgment prohibiting it from, among other things, using the word "vampire" anywhere in the world in connection with beverage products. Cramele Recas has done precisely what it was ordered not to do; and then it merely changed the word "vampire" to the synonym bloodsucker, which in the present context does not permit them to escape liability. And if using bloodsucker is not a breach of the express terms of the judgment (which is in essence a contract enforceable by the contempt power of

this court), it is in the alternative a breach of the covenant of good faith and fair dealing.

Notably, defendants do not contest the validity of Count I – Breach of Contract nor do they contest the validity of Count III – for intentional interference with the Contract.

In sum, Defendant's motion must be denied with the sole exceptions being (1) that Count VI should be dismissed as Plaintiff VFB agreed, and (2) the last sentence of paragraphs 116 and 124 of the First Amended Complaint should also be stricken as VFB agreed.  The rest of the FAC should survive as written.

## II.   FACTUAL BACKGROUND.

The FAC sets forth a long history  of the relationship between the VAMPIRE brand and TI Beverage Group Ltd ("TI Beverage"), VFB's predecessor in interest, on the one hand and Defendants Cramele Recas and Tri-Vin on the other hand.  Briefly, however, Cramele Recas was TI Beverage's supplier of VAMPIRE wine.  (Dkt. 27 at ¶¶ 53-54.)

In 2006, when Cramele Recas began infringing VFB's predecessor in interest's trademark rights, TI Beverage withheld money otherwise due Cramele Recas and sued for trademark infringement.  *Id.* at ¶¶ 36-37.  The parties settled, and the settlement agreement became a Stipulated Judgment with both parties requesting and agreeing to this Court retaining jurisdiction.  *Id.* at ¶¶ 38-39 and Exhibit 1 to the FAC.

Tri-Vin had been the New York distributor of VAMPIRE wine for VFB's predecessor in interest.  *Id.* at ¶¶ 54, 58.  At the time, VAMPIRE wine was produced by Cramele Recas.  *Id.* at ¶ 55.  Moreover, at all relevant times Tri-Vin was aware of the dispute between TI Beverage and Cramele Recas, and Tri-Vin was aware of the terms of the dispute's resolution.  *Id.* at ¶ 66.  Bracus Imports, LLC ("Bracus"), a company headquartered in California, and which is owned by

Tri-Vin's President and wife, has sold the accused product in California[2].  *Id.* at ¶¶ 8, 70.

Unbeknownst to VFB, a few years ago, defendant Cramele Recas violated this Court's Order and breached its agreement not to sell wine using the word vampire by doing just that, selling wine labeled as "BLOODY MERLOT FROM THE LAND OF VAMPIRES" and "BLOODY CABERNET SAUVIGNON FROM THE LAND OF VAMPIRES" to a very large supermarket chain in Europe. *Id.* at ¶ 66.  Once Cramele Recas began selling that same wine to defendant Tri-Vin, VFB became aware of the breach and contempt by Cramele Recas.  VFB investigated further and filed suit.  *Id.*  Moreover, recognizing that VFB would likely learn of the violation, Defendants modified the label to use "FROM THE LAND OF BLOODSUCKERS" instead of "FROM THE LAND OF VAMPIRES." But, "bloodsuckers" is a well-known synonym for "vampires."  *Id.* at ¶ 69. Moreover, Defendants labels are designed so that consumers immediately make that connection, and Defendants' marketing collateral continued to reference "vampires."  *Id.* at ¶¶ 45, 46, and 49.

To get out from under the terms of the Contract and this Court's Order, defendants changed the word "vampire" on the bottle label to "bloodsucker" with the intention that the consumer would of course understand that they were not referring to a leech but instead to a vampire – particularly when the packaging had numerous references to Transylvania, legends, as well as vampire imagery such as vampire bats and fangs.  *Id.* at ¶¶ 45, 46.  Despite defendants' statements to the contrary, all defendants sold, marketed, and promoted wine in the US using both the literal term "vampire" and its synonym "bloodsucker."

---

[2] Previously, Tri-Vin had pretended this Court lacked personal jurisdiction when it filed a motion to dismiss for lack of personal jurisdiction.  (Dkt. No. 23.)  After VFB reminded Tri-Vin, in the FAC, about Tri-Vin selling accused product to its affiliated Californian entity, Bracus, Tri-Vin dropped its jurisdictional challenge.

**III.       LEGAL STANDARD.**

To survive a Rule 12(b)(6) motion to dismiss for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), a complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 687.  In considering a motion to dismiss, the court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *Erickson v. Pardus*, 551 U.S. 89, 93-94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007).

A court may grant a dismissal <u>only</u> where the complaint fails to present a cognizable legal theory or fails to allege sufficient facts to support a cognizable legal theory.  *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).

VFB need not recite the legal standard applicable to Rule 12(b)(7) challenges as the basis for defendants' challenges under the failure to join a necessary and indispensable party has become moot as discussed directly below.

**IV.    ARGUMENT**

**A.       Defendants' Defense that VFB has Failed to Join and Indispensable Party is Moot.**

On March 22, 2021, Fior di Sole assigned its interest in the Vampire trademark registration number 2263907 to Plaintiff VFB.  The assignment document was recorded on March 23, 2021.  A true and correct copy of the Notice

of Recordation of the Trademark Assignment dated March 24, 2021, is attached as Exhibit 1 to the Machat Decl.

Thus, even if there was any merit to Defendants' claims of failure to join an indispensable party, those claims are now moot, as VFB is now the sole owner of each of the trademarks asserted in the First Amended Complaint ("FAC"). Defendants no longer need to fear the possibility of duplicative actions for the same conduct.

### B.     VFB has already agreed to dismiss its dilution claim, i.e., Count VI, and does not contest this claim.

As previously stated, VFB informed defendants prior to their filing of their motions to dismiss that VFB was amenable to dismissing Count VI of the FAC, for dilution.  *See* Machat Decl. ¶¶ 5-7, Exhibits 2 and 3.  VFB believes it can make out a claim for dilution but sees no point in debating what in essence would be a distraction from the main issues in this case.  The dilution claim is not needed for VFB to prevail in this matter, and thus VFB agreed not to pursue it.  *Id.*

### C.     VFB Agreed to delete the last sentence in Counts IV and V, which make a request for punitive damages for VFB's Lanham Act claims; Defendants failed to meet and confer on the propriety of any other allegations regarding punitive damages and thus Defendants improper motion should be denied.

VFB agreed that the request for punitive damages in Counts IV and V was mistakenly pled, as those are federal trademark claims, and had already agreed to not pursue Count VI.  Thus, when Defendants Tri-Vin and Bracus raised this issue, Plaintiff VFB agreed to delete the punitive damages allegation from Counts IV and V in response to Defendants Tri-Vin and Bracus request, which was premised entirely on the impropriety of punitive damages for federal trademark claims.[3]  *See*

---

[3] The request for punitive damages was inserted in connection with Count III—for tortious interference with a contract—and was then mistakenly copied and pasted

Machat Decl. ¶ 5, Exhibit 2.  None of the Defendants met and conferred with respect to the alleged insufficiency of Plaintiff's claim for punitive damages in connections with Counts III and VII, which are state claims.  *Id.*  Punitive damages are recoverable for intentional interference with contract claims.  *Duff v. Engelberg*, 237 Cal.App.2d 505, 509 (1965).  Punitive damages are also available for state trademark infringement claims.  *Getty Petroleum Corp. v. Island Transp. Corp.*, 862 F.2d 10, 13-14 (2d Cir. 1988), cert. denied, 490 U.S. 1006, 104 L. Ed. 2d 157, 109 S. Ct. 1642 (1989); *see also Monster Energy Co. v. Integrated Supply Network, LLC*, 821 Fed. Appx. 730, 732-33 (9th Cir. 2020) (vacating $5,000,000 punitive damages award because jury had awarded $0 in actual damages, not because punitive damages were improper).  Thus, Defendants' motion to strike plaintiff's allegations related to punitive damages for Count III and VI should be denied for failure to meet in confer in compliance with L.R. 7-3, as well as on the merits.  Notably none of the defendants have objected to the substance of Count III.

### D.  Of course there is a likelihood of confusion between VFB's VAMPIRE mark and Defendants' use of both "Land of Vampires" and "Land of Bloodsuckers."

Defendants have chosen to analyze likelihood of confusion between the wrong marks.  VFB is not accusing defendants of wrongfully using the word "bloody" in the abstract.  Bloody can have several meanings, such as "bloody good."  Defendants fail to analyze and only make scant reference to their use of "bloodsucker" for an obvious reason, it is a well-known synonym for Vampire.  And, given the overall commercial context, including the label and associated

---

at the end of Counts IV through VI.  As previously stated, VFB had already agreed not to pursue Count VI, as well as delete the punitive damages allegations from Counts IV and V.  Defendants Tri-Vin and Bracus refused to permit Plaintiff to amend.  Machat Decl. ¶ 7, Exhibits 2, 3.

marketing materials, this was clearly what Defendants intended to communicate to consumers.  So while "bloodsucker" can also mean "leech" in some contexts, surely Defendants cannot contend, at least plausibly, that is the commercial impression intended to be communicated to consumers in the present context.

Defendants incorrectly argue that VFB's trademark registration for VAMPIRE for wine (registration number 2263907) should not be considered in the likelihood of confusion analysis (Dkt. 36, at 13:17-24).  Defendants' argument is based on the false assertion that VFB is not the sole owner of the registration.  As discussed *supra*, however, VFB actually is the sole registrant of each asserted mark, including the most important registration for wines.  Defendants' likelihood of confusion analysis is thus deeply flawed, and Contrary to defendants' arguments, the FAC contains facts sufficient to plausibly allege a claim for trademark infringement, including the necessary likelihood of confusion to support such a claim.

In order to establish a trademark infringement claim under either section 15 USC § 1114 or 15 USC § 1125, a party "must prove: (1) that it has a protectible [sic] ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006); *see also Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).[4]

Defendants do not contest the validity of the Vampire registration number 2263907; instead, defendants argue that VFB is only a fifty percent owner.  Now that VFB is the sole 100% owner of the registration, defendants' arguments as to

---

[4] "The same standard is embodied" in § 1125(a)(1) and § 1114, but § 1125(a)(1) applies to both registered and unregistered trademarks, while § 1114(1) applies only to federally registered marks. *Brookfield*, 174 F.3d at 1046 n.6.

ownership are moot.  If a jury were to conduct a likelihood of confusion analysis, it seems a finding of infringement for VFB would be fairly quick.

Defendants mistakenly fail to conduct a likelihood of confusion analysis between the Vampire wine trademark registration no. 2263907 and defendants use of "Bloodsucker."  On the other hand, Paragraphs 49 to 50 of the FAC and Exhibits 8 and 9 of the FAC show that Bloodsucker means vampire.  Vampire is obviously confusingly similar to vampire, particularly in the commercial context in which the parties' respective products must be considered.

The Ninth Circuit considers the following factors when analyzing the likelihood of confusion:  1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. Defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines.  *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979).  VFB will analyze each in turn.

### (1)    Strength of the Plaintiff's Mark

Marks are generally classified along a spectrum, with descriptive marks being the weakest, and arbitrary or fanciful marks being the strongest.  *Sleekcraft,* 599 F.2d at 349; *Brookfield Commc'ns*, 174 F.3d at 1058 (stating that "unlike arbitrary or fanciful marks which are typically strong, suggestive marks are presumptively weak" and explaining the differences between categories of marks). The more generic or descriptive a trademark is, the less worthy of protection it is, and as the trademark becomes more descriptive, more "confusion with the marks of legitimate competitors might be expected."  *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998).  Nevertheless, "placement within the conceptual distinctiveness spectrum is not the only determinant of a mark's strength, as advertising expenditures can transform a suggestive mark into a

strong mark where, for example, that mark has achieved actual marketplace recognition."  *Brookfield Commc'ns*, 174 F.3d at 1058.

Here, VFB's Vampire Mark is a strong, arbitrary mark for all the goods to which it is applied, including wine.  The word "vampire" has nothing to do with wine or vodka or any of the products in dispute in this case.  Indeed, just as Apple, which is an arbitrary mark for the company that sells iPhones and computers, Vampire is arbitrary for wine, spirits, and cocktails.  Defendants' have no argument as to the strength of the mark, other than to try and point out that others use blood too.  But that it is not a legitimate defense to their use of vampire or its synonym, bloodsucker. Indeed, none of the uses that Defendants point to use "bloodsucker".  Moreover, many use "blood" in a descriptive sense, such as for blood oranges, but none use it to connote vampires like Defendants intentionally did with "bloodsuckers" and the related vampire imagery found on Defendants bottles and marketing materials.

The strength of VFBs marks is also demonstrated by the extensive sales that it made and press it has obtained throughout the U.S. over the last 20 plus years that it has been selling VAMPIRE wine.  (*See, e.g.,* Dkt. 27, ¶¶ 17, 21, 26, 24, 127.)  The power and strength of the brand is also evidenced by Cramele Recas prior copying of the brand, as well as Defendant Tri-Vin's distribution of Plaintiff's VAMPIRE wines for approximately years.  (*See, e.g.,* Dkt. 27, ¶¶ 41, 54.)

### (2)     Proximity of the Goods

Proximity of the goods is measured by the relatedness of the goods—specifically, proximity is measured by evaluating whether the goods are "(1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011). "For related goods, the danger presented is that the

public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. Here, the applications are closely related and sold to the same class of purchasers. All parties sell wine to wine consumers, and defendants' use of "bloodsucker", "vampire" and is packaging is likely to cause confusion with VFB's family of Vampire marks. Indeed, Defendant Cramele Recas used to make Plaintiff's wine and Defendant Tri-Vin used to be Plaintiff's distributer. (Dkt. 27, ¶¶ 53-55.)

### (3) Similarity of the Marks

The degree of similarity between the parties' trademarks is an important factor. *See Brookfield Commc'ns*, 174 F.3d at 1054. "[T]he more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion. In analyzing this factor, the marks must be considered in their entirety and as they appear in the marketplace." *Id.* (internal citations and quotation marks omitted). Moreover, "[s]imilarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351 (finding similarity of sight, sound, and meaning between "Sleekcraft" and "Slickcraft"); *Dreamwerks*, 142 F.3d at 1131 (finding that similarity between "Dreamwerks" and "DreamWorks" was likely to cause confusion); *Well Care Pharmacy II, LLC v. W' Care, LLC*, No. 2:13-CV-00540-GMN, 2013 WL 3200111, at *5 (D. Nev. June 24, 2013) ("finding that the overwhelming similarity of the marks" WELL CARE and W' CARE "favors a finding that Plaintiff will likely succeed in establishing the likelihood of confusion element of its unfair competition claim").

Here the obvious meaning of "bloodsucker" is identical to that of the mark Vampire. If one were to consider defendants packaging as a whole with VFB's VAMPIRE wine brand, consumers would naturally conclude they are from the same source or the same source sponsors both wines. If one adds in the fact that VFB sells a variety of vampire related wines, including Dracula wine and

---

Dracula's Blood, as well as owns the slogans "Sip the Blood of the Vine," "Taste of Immortality," and "The Legend Lives" it is apparent the marks are the same. The distinctions and clarifications defendants seek are better suited for discovery requests.  Plaintiff need not prove its case in a motion to dismiss.  It only needs to demonstrate it is entitled to prove its case.  *See e.g., Jackson v. Carey,* 353 F.3d 750, 755 (9th Cir.2003); *Yang v. DTS Financial Group*, 570 F.Supp.2d 1257, 1259 (S.D. Cal. 2008).  Such is the situation here.  A complaint needs to be adequate, not perfect.  Defendants seek to pick apart small pieces while ignoring the obvious similarity between all parties use of vampire and defendants' use of bloodsucker as a synonym for vampire.

With respect to the situations where defendants have actually used the word "vampire" on its label, the similarity of the marks and associated advertising it is even more of a foregone conclusion of a likelihood of confusion.

### (4)    Actual Confusion

Evidence of actual confusion is strong evidence of a likelihood of confusion in the future.  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1150 (9th Cir. 2002).  And while courts have noted that a reasonable juror could find de minimis evidence of actual confusion to be ultimately unpersuasive in the overall assessment of likelihood of confusion (*id.*), Plaintiff has identified at least one instance of actual confusion, where someone reached out to Plaintiff after seeing defendants' promotion of its accused product on Facebook (Dkt. 27, ¶ 25.) And, while Plaintiff believes that this demonstrates the sufficiency and plausibility of its allegations and that the likelihood of confusion issue should ultimately be decided by a fact finder, Plaintiff also notes that a showing of actual confusion is not even necessary to a finding of likelihood of confusion, *Network Automation*, 638 F.3d at 1151.

### (5) Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d 1156, 1164 (N.D. Cal. 2011) (internal quotation marks omitted). Here, all parties use virtually identical marketing channels.

Plaintiff distributes its wines nationally as Defendant Tri-Vin does with Defendant Cramele Recas's wines. (Dkt. 27, ¶¶ 80, 52, 56.) Indeed, that the parties use the same channels is plainly evidenced in the present case from the allegations of the complaint in that at one time Plaintiff VFB used Defendant Cramele Recas to produce its wine and used Defendant Tri-Vin to distribute its wine. (Dkt. 27, ¶¶ 53-56.) There cannot be more closely aligned distribution channels.

Nonetheless, the FAC plausibly alleges facts from which it can be inferred that all parties sell their wines to wine distributors, wine retailers and to wine consumers. (Dkt. 27, ¶¶ 52, 69, 70, 71, 80.) VFB additionally sells its wine online, and defendants' retailers also sell the accused products online. (Dkt. 27, ¶ 80.) All parties use social media for online marketing, such as Facebook where a wine consumer first saw defendants' Bloody Merlot from the land of Vampires and inquired of VFB. (Dkt. 27, ¶¶ 52, 69, 70, 71, 80.) Thus, this factor favors Plaintiff. *See, e.g., Treemo, Inc. v. Flipboard, Inc.*, 53 F. Supp. 3d 1342, 1363–64 (W.D. Wash. 2014) (finding that fact that both parties used the Internet as their primary marketing and advertising channel and exclusively sold their apps in the same app stores. "could easily result in a consumer searching for and then downloading the wrong app," weighing toward a finding of likelihood of confusion).

### (6)   Type of Goods and Degree of Care Likely to Be Exercised by the Purchaser

Both Plaintiff and Defendants market their bottles of wine for less than $15.00.  (Dkt. 27, ¶ 80, Exhibit 15.)  In fact, defendants' bottle of wine has been found offered online for just $7.  (*Id.* at Exhibit 15.)  A customer is unlikely to exercise significant care when choosing between two low-cost products.  *Surfvivor*, 406 F.3d at 634 ("With respect to small, inexpensive goods ... the consumer is likely to exercise very little care."); *Brookfield Commc'ns*, 174 F.3d at 1060.

As readily inferred from the allegations in the complaint, the products in question are meant for relatively immediate consumption, particularly when purchased by the glass in a restaurant.  There's very little care at all applied here.  Probably more care is spent on shampoo, which is expected to last many days as opposed to being consumed in a single seating like an inexpensive bottle or glass of wine.  Moreover, Defendants' wine is  priced at a low end of the market, the end where the consumer less likely to be discerning about wine they are consuming.  Whereas VFB goes out of its way to make the best wine possible, Defendants' do not care much about the quality of their wine; instead, they seek to make a quick sale, not caring about the repeat customers.  It is quite likely that the Defendants consumer might think that VFB is the producer of Defendants' accused product, weighing toward a finding of likelihood of confusion.

### (7)   Defendants' Intent in Selecting the Mark

The intent factor is merely a proxy for determining likelihood of confusion—if a defendant picks a trademark with the intent to confuse, then the mark is more likely to be confusing because, after all, the defendant thought it would be confusing.  *Entrepreneur Media*, 279 F.3d at 1148 ("[T]he point is not that an intent to confuse is relevant as some measure of culpability. Rather, the alleged infringer's judgment as to what is likely to be confusing is relevant because

---

it may well be accurate.").  As alleged in the FAC, the defendants were all very familiar with VFB's Family of Vampire marks.  (Dkt. 27, ¶¶ 53-56.)  Defendant Cramele Recas at one time produced Vampire and defendant Tri-Vin distributed it for many years.  *Id.*  As alleged in the complaint, Tri-Vin missed selling Vampire wine and wanted to replace what it had to sell alongside its Werewolf Wine.  (Dkt. 27, ¶¶ 61-62.)  Defendant Cramele Recas was all too willing to oblige as it was already selling wine, in contempt of court, with the word "vampire" on its labels in supermarkets in Austria and Germany.  (Dkt. 27 ¶ 65.)  Defendants chose the mark because they believed any wine with the word "vampire" on it would sell, at least initially.  (Dkt. 27, ¶¶ 57, 83.)  Thus, this factor also weighs toward a likelihood of confusion.

### (8)   Likelihood of Expansion of the Product Lines

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing."  *Sleekcraft*, 599 F.2d at 354.  As a practical matter, "likelihood of expansion" is largely moot, as both parties are already directly competing against one another.  *See Brookfield Commc'ns*, 174 F.3d at 1060 ("The likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent."); *Flipboard*, 53 F. Supp. at 1366 ("Because the ... apps already compete directly, the Court need not consider whether the likelihood of expansion of product lines will further weigh in favor of finding that the present use is infringing.").  Nevertheless, VFB has demonstrated a likelihood to expand into related uses of its Vampire mark, such as its use of Dracula for wine, with the registered mark 3319536 , and its use of Dracula's Blood for wines (Dkt. 27 ¶¶ 51, 119), and its use of Vampyre for vodka (registration no. 3082097) highlighting that its consumers who have bought  its

bottles of Vampire wine will perceive any new beverage offering along the vampire line as one of Vampire Family Brand's offerings. Thus, this factor also weighs heavily in VFB's favor.

### (9)   Likelihood of Confusion Overall

A likelihood of confusion naturally flows from an analysis of each of the factors, making out a prima facie case of intentional and willful trademark infringement. Far from defendants' argument that plaintiff has failed to make out a plausible case for trademark infringement, instead plaintiff has alleged sufficient facts for any jury to find in plaintiff's favor.

### E.   The Count for Breach of the Covenant of Good Faith and Fair Dealing Has Been Properly Pled.

VFB's claim is valid. Assuming the use of the term "from the land of bloodsuckers is contractually permitted," according to its argument, Defendant <u>Cramele Recas then would reap</u> the Contract's benefits (by keeping the hundreds of thousands of dollars paid to it) <u>while depriving Plaintiff of benefits</u> (due to the non-adherence to the purpose of the Contract). This provides a paradigmatic instance of the proper application of "the implied covenant of good faith and fair dealing" that applies "under California law." *Cobb v. Ironwood Country Club*, 233 Cal.App.4th 960, 965–66 (2015).

> The covenant operates "'as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.'" "The covenant of good faith finds particular application in situations where one party is invested with a <u>discretionary power</u> affecting the rights of another."

*Id.* at 966 (underlining added) (quoting *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 372 (1992); other citation omitted).

Here, the Implied Covenant is applicable because Cramele Recas claims it may use a term, such as bloodsucker, which is obviously meant to convey the term "vampire"—where the wording and images on Cramele Recas' labels is to be determined *unilaterally* by Cramele Recas <u>in its sole discretion</u>.

Defendants cite off-point case law concerning duplicative causes of action ; the case law is in inapplicable where (as here) the plaintiff has pleaded in the alternative (or is capable of pleading in the alternative). Breach of the Implied Covenant "involves unfair dealing, <u>whether or not it also constitutes breach of a consensual contract term</u>.'" *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F.Supp.2d 846, 852 (C.D. Cal. 2004) (emphasis added) (quoting *Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal.App.3d 1371, 1395 (1990)).

Per the foregoing language from *Careau* (as quoted in *Celador*), the two causes of action (for breach of contract and breach of the Implied Covenant) are properly pleaded *in the alternative*. The Implied Covenant provides a basis for recovery, even where (at trial) the plaintiff cannot prove that the contract was breached. *See also IV Sols., Inc. v. Connecticut Gen. Life Ins. Co.*, No. cv 13-9026-GW(AJWX), 2014 WL 12603215, at *6 (C.D. Cal. Mar. 27, 2014) ("Plaintiff could potentially recover for breach of the covenant of good faith and fair dealing…, but ultimately not recover for breach of contract …. Therefore, the claims are not clearly duplicative….."). *See also Longest v. Green Tree Servicing LLC*, 74 F.Supp.3d 1289, 1301 (C.D. Cal. 2015). Moreover, "the [implied] covenant prevents a party from acting in bad faith to frustrate the contract's *actual* benefits." *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 353 n.18 (2000) (emphasis in original). Hence, VFB stated a valid cause of action for breach of the Implied Covenant.

**F.      The Balance of Defendants' Arguments equally lack merit.**

VFB need not address defendant Cramele Recas's argument regarding subject matter jurisdiction since as discussed above, the trademark claims are sufficiently pled.  Defendants' arguments as to the alleged lack of confusion between defendants' accused product and VFB's common law marks is nothing more than a red-herring.

Defendant Cramele Recas cites the proposition that when comparing marks, one should not dissect them; yet their argument does exactly what they say should not be done.

As the Second Circuit has observed: "[T]he Lanham Act requires a court to analyze the similarity of the products in light of the way in which the marks are actually displayed in their purchasing context." *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 76 U.S.P.Q.2d 1852 (2d Cir. 2005) ("the District Court committed error by denying a preliminary injunction after viewing the conflicting trade dresses side-by-side and finding that there were significant differences").

As Professor McCarthy states in his treatise, "the 'anti-dissection' rule is a specific application of the general rule that infringement is determined by customer perception. As the Court of Customs and Patent Appeals (CCPA) observed, 'Purchasers of retail services do not engage in trademark dissection. Legal surgery, in which trademarks have parts enhanced or discarded, is of little aid in determining the effect of design marks on purchasers who merely recollect. The scalpel is employed by lawyers, not purchasers.' What must be determined is the initial reaction or impact of defendant's mark on the purchasing public. Where that initial impact is one of likely confusion, the fact that further investigation might reveal that no connection with plaintiff exists is not relevant."  4 McCarthy on Trademarks and Unfair Competition § 23:58 (5th ed.)

Comparing the totality of defendants' accused product packaging with the totality of VFB's family of brands reveals a likelihood of confusion.

Comparing the totality of defendants' accused product packaging with the totality of VFB's family of brands reveals a likelihood of confusion.

## V.   IN THE EVENT THIS COURT FINDS ANY PART OF THE COMPLAINT LACKS REQUIRED ALLEGATIONS, VFB ASKS FOR LEAVE TO AMEND

Where a motion to dismiss is granted, a district court should provide leave to amend unless it is clear that the complaint could not be saved by any amendment). *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir. 1996).  The Federal Rules provide that leave to amend should be "freely given when justice so requires."  Fed. R. Civ. P. 15(a).  The Ninth Circuit requires that this policy favoring amendment be applied with "extreme liberality."  *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).  Thus, if the Court perceives a defect in the First Amended Complaint, VFB respectfully requests leave to amend.

## VI.   CONCLUSION

For the foregoing reasons, both motions to dismiss the complaint should be denied except with respect to Count VI for dilution and the references to punitive damages in Counts IV and V, which Plaintiff offered to do prior to the filing of Defendants' motions.

Respectfully submitted,

Dated:  March 31, 2021

By: /Michael Machat/

Michael Machat, Esq. (SBN 109475)
michael@machatlaw.com
**MACHAT & ASSOCIATES, P.C.**
8730 W. Sunset Blvd., Suite 250

1

West Hollywood, California 90069
Tel.: (310) 860-1833

2

3

David A. Randall (SBN 156722)
dave@hdmnlaw.com

4

Ehab Samuel (SBN 228296)
esamuel@hdmnlaw.com

5

**HACKLER DAGHIGHIAN**

6

**MARTINO & NOVAK P.C.**

7

10900 Wilshire Blvd., Suite 300

8

Los Angeles, CA 90024
Tel.: (310) 887-1333

9

Fax: (310) 887-1334

10

11

Attorneys for Plaintiff
Vampire Family Brands, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28